# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# OCALA DIVISION

GEOFFREY H. ANDERSON,

      Plaintiff,

v.                                      Case No:  5:15-cv-26-Oc-30PRL

JOHN MOORE, CHARLES W.
RUSSELL, SCOTT PENVOSE, and
SHERIFF GARY S. BORDERS, in his
official capacity,

      Defendants.

_____/

# **<u>ORDER</u>**

THIS CAUSE comes before the Court upon Defendant Sheriff Gary S. Borders'

("Sheriff Borders") Motion for Summary Judgment (Doc. 84), Plaintiff's response in

opposition (Doc. 98), Defendants Officer John Moore, Officer Charles Russell, and Officer

Scott Penvose's (collectively, the "Officer Defendants") Motion for Summary Judgment

(Doc. 110), and Plaintiff's response in opposition (Doc. 112).  The Court, having reviewed

the motions and responses, and being otherwise fully advised in the premises, concludes

that Sheriff Border's motion should be granted and the Officer Defendants' motion should

be granted in part and denied in part.

# UNDISPUTED FACTS[1]

## I.  Facts Relating to Plaintiff's Claims Against the Officer Defendants

On the morning of January 23, 2011, Groveland Police Department ("GPD") Officer Scott Penvose and his partner were looking for a suspect, Russell Drawdy, who was wanted under an arrest warrant for domestic violence.[2]  Although Drawdy informed the GPD that he was in Orange County, Florida, GPD officers received a tip through dispatch that Drawdy was seen at Plaintiff's residence at 410 Howey Road, Groveland, Florida.

When Officer Penvose and his partner arrived at Plaintiff's residence, Plaintiff saw the police car pull up and met the officers outside.  Officer Penvose informed Plaintiff that the GPD was looking for Drawdy and wanted to search Plaintiff's residence.  Plaintiff complained that GPD officers had been to his residence the day before looking for Drawdy and did not find him.  Plaintiff told Officer Penvose that he was aware of his right to have a search warrant presented.  When Plaintiff objected, Officer Penvose told Plaintiff that he could get a search warrant, and that if Plaintiff refused consent, he would arrest Plaintiff for obstruction of justice.  Ultimately, Plaintiff consented to the search of his residence.

Officer Penvose searched Plaintiff's home for approximately ten to fifteen minutes; Plaintiff was not permitted to accompany Officer Penvose.  Officer Penvose also asked Plaintiff to open a shed on the property, and Officer Penvose spent approximately one minute looking inside.  Drawdy was not found at Plaintiff's residence and was later arrested

---

[1]On a motion for summary judgment, the court construes the facts and reasonable inferences in the light most favorable to the nonmoving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 320 n.2 (1986).

[2]Drawdy's arrest warrant for domestic violence was premised upon allegations that he hit and pushed his girlfriend.  (Doc. 110, Ex. A).

in Orange County, Florida.  Plaintiff was not physically restrained during the search, and officers from the GPD did not return to his home.

Plaintiff had a second encounter with officers from the GPD several months later on August 5, 2011, at his new residence of 126 Jim Payne Road, Apt. F29, Groveland, Florida.  Officer John Moore and Officer Charles Russell responded to a call from a neighbor reporting that Plaintiff had broken into the residence.  Specifically, a neighbor stated that Plaintiff entered the residence through a window and Plaintiff "was not supposed to be there."  (Doc. 110, Ex. B).  When the officers arrived at the residence, Officer Moore observed that the front window to the residence was unsecured, and Officer Russell observed that the back window was broken.  Officer Moore pulled back the blind on the unsecured front window and observed no furniture or other signs that someone was living there.  After making attempts to see if someone would answer the door and receiving no response, Officer Moore entered the residence through the unsecured front window.

Officer Russell checked a rear bedroom and found Plaintiff exiting the door toward him.  The officers either ordered Plaintiff to the ground or threw him to the ground, and handcuffed and kicked him.  Plaintiff was then placed on his bed while the officers asked him some questions.  Plaintiff explained that he entered the residence through the back window because he was the current resident, and the property manager improperly changed the locks.  The officers called the property manager who advised that he was in the process of evicting Plaintiff.[3]  Plaintiff was then released and no further action was taken.

_____

[3]Plaintiff asserts that he and the property manager were embroiled in a civil dispute over the occupancy of the residence, but that he had already moved most of his belongings out of the residence as a result of the dispute.

3

## II.  Facts Relating to Plaintiff's Claims Against Sheriff Borders

Plaintiff was arrested on August 21, 2011.  He complained of chest pains and was taken to the emergency room where he was treated.  Following his arrest, a first appearance hearing was held on August 22, 2011.  Plaintiff was unable to attend the first appearance due to his hospitalization.  His absence was noted on the first appearance form.  Plaintiff agreed that his health prevented him from leaving the hospital prior to his release.  Plaintiff did not receive any communication from the court regarding his first appearance hearing, and Plaintiff never asked to contact a lawyer while he was in the hospital.  A second first appearance hearing was not held for Plaintiff so that he could attend.

After Plaintiff was released from the hospital at 12:00 p.m. on August 22, 2011, he was transported to the Lake County Detention Center in a wheelchair.  Plaintiff received a superficial medical screening when he arrived at the jail, but he asserts that his medical issues were not properly recorded by jail personnel.  Plaintiff was then placed in booking cell B1A, which he asserts was a maximum security isolation cell.  The cell had a bunk bed inside, but Plaintiff was the only person in the cell.

Prior to his incarceration, Plaintiff used a cane at all times to assist him in ambulating because he had a back injury from an incident in 2005 involving an altercation with the Tallahassee police.  When he was transported to the jail, Plaintiff was permitted to retain the wheelchair until August 24, 2011.  On August 24, the wheelchair was removed from Plaintiff's cell and he was unable to move around the cell to retrieve food or take care of personal needs.  After the wheelchair was taken away, Plaintiff urinated on himself

because he was unable to get to the toilet unassisted.  During this time, a nurse checked on Plaintiff to take his pulse and blood pressure.

Plaintiff alleges that on August 25, after the wheelchair was taken away, he attempted to commit suicide using the sheet from his bunk.  Some unidentified individual, who Plaintiff refers to as a "jail trusty," interrupted Plaintiff's attempt by asking him what he was doing.  Plaintiff was ashamed and told the "trusty" that he was trying to get to the toilet.  Shortly thereafter, Plaintiff was transferred to the medical ward and provided a walker.  He did not inform anyone else at the jail about his suicide attempt.

Prior to his arrest, Plaintiff was only taking aspirin for his heart, but he was prescribed several medications following his release from the hospital on August 22, 2011.  Plaintiff cannot recall whether he received the medications at the jail from August 22, 2011, until August 25, 2011, but believes he began receiving medications later in the week after the jail received verification of Plaintiff's medical records from the hospital.

## SUMMARY JUDGMENT STANDARD OF REVIEW

Motions for summary judgment should be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp.*, 477 U.S. at 322 (internal quotation marks omitted); Fed. R. Civ. P. 56(c).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The substantive law applicable to the claimed causes of

action will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his or her favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248-49.

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir.1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## <u>DISCUSSION</u>

### I. Claims Against the Officer Defendants

Two claims remain against the Officer Defendants under 42 U.S.C. § 1983: (1) violation of the Fourth Amendment by Officer Penvose regarding the January 23, 2011

search of Plaintiff's residence (Count II), and (2) violation of the Fourth Amendment by Officers Moore and Russell regarding entry of Plaintiff's residence on August 5, 2011 (Count III). To state a claim under § 1983, Plaintiff must establish that (1) the Officer Defendants' conduct caused the constitutional violation, and (2) the challenged conduct was committed "under color of state law." *See Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1276-77 (11th Cir. 2003).

The Officer Defendants assert that they are entitled to qualified immunity from Plaintiff's claims. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004) (internal quotation marks omitted). "This formulation of the qualified immunity inquiry is intended to protect government officials 'from undue interference with their duties and from potentially disabling threats of liability.'" *Jordan v. Doe*, 38 F.3d 1559, 1565 (11th Cir. 1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)).

"To receive qualified immunity, 'the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Kingsland*, 382 F.3d at 1232 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). Once a defendant raises the issue of qualified immunity and demonstrates that the acts complained of were committed within the scope of his or her discretionary authority, "the burden then shift[s] to the [plaintiff] to show that qualified immunity should not apply because: (1) the officers violated a constitutional right, and (2)

7

that right was clearly established at the time of the incident." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009). "Qualified immunity is not appropriate where the officer's actions were objectively unreasonable: that is, under the facts and circumstances known to the officer at the time, his actions violated clearly established law." *Bates v. Harvey*, 518 F.3d 1233, (11th Cir. 2008).

It is undisputed that on both January 23, 2011, and August 5, 2011, Officers Penvose, Moore, and Russell were acting within their discretionary authority. Thus, whether the Officer Defendants are entitled to qualified immunity will turn upon whether Plaintiff has demonstrated that the Officer Defendants violated a clearly established constitutional right.

### A.  The January 23, 2011 Search (Count II)

Plaintiff asserts that Officer Penvose violated his Fourth Amendment right from unreasonable searches by obtaining Plaintiff's consent to search his home through coercion. Officer Penvose does not dispute that he entered Plaintiff's home without a search warrant. Rather, Officer Penvose argues that Plaintiff consented to the search, or, alternatively, exigent circumstances justified the search.

It is well-established that a warrantless search of an individual's home is presumed to be unreasonable and a violation of the Fourth Amendment. *See Holmes v. Kucynda*, 321 F.3d 1069, 1078 (11th Cir. 2003). But it is equally well-established that a warrantless search conducted pursuant to voluntary consent is constitutional. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). "[T]o be considered voluntary, . . . consent to search 'must be the product of an essentially free and unconstrained choice.'" *United*

*States v. Zapata*, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989)).  Whether consent is voluntary, and not the result of coercion, express or implied, is assessed pursuant to the totality of the circumstances.  *Id.* at 248.  Relevant factors include "whether the person is in custody, the existence of coercion, the person's awareness of his right to refuse consent, the person's education and intelligence, and whether the person believes that incriminating evidence will be found." *Johnston v. Tampa Sports Auth.*, 530 F.3d 1320, 1326 (11th Cir. 2008) (citing *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)).

Officer Penvose argues that Plaintiff has not demonstrated a constitutional violation because Plaintiff voluntarily consented to the search.  What was completely omitted from Officer Penvose's discussion of Plaintiff's claim, however, is Plaintiff's allegation that Officer Penvose threatened to arrest Plaintiff if he did not provide consent for the search.  Plaintiff asserts that Officer Penvose told him that he was "obstructing a police officer" and that he could obtain a search warrant and would take Plaintiff to jail for obstruction of an officer and interfering in a criminal investigation.  (Plaintiff Depo. at 201, 213-14).  Officer Penvose's motion for summary judgment is completely silent as to the issue of coercion.

"A suspect's consent to search may be tainted by a threat of detention that essentially amounts to an arrest if consent is refused." *Eidson v. Owens*, 515 F.3d 1139, 1146 (10th Cir. 2008) (citing *United States v. Ocheltree,* 622 F.2d 992, 994 (9th Cir.1980)).  According to the undisputed facts, Officer Penvose threatened Plaintiff with arrest if he refused consent to the search.  Although Plaintiff admits that he is familiar with Fourth Amendment

9

law and discussed the warrant requirement with Officer Penvose, such a threat is sufficient to overcome the will of a reasonable individual. Even if Plaintiff believed that Officer Penvose had no grounds upon which to arrest him, a reasonable individual would want to avoid the risk of being jailed on an unsubstantiated charge. Moreover, if Plaintiff believed Officer Penvose was willing to arrest him on an unsubstantiated charge, it would not have been a stretch to believe that Officer Penvose would have no qualms with conducting a search in violation of the Fourth Amendment. Consequently, Plaintiff's consent was not voluntary, and the warrantless search cannot be justified on Plaintiff's voluntary consent.

Officer Penvose also argues that the warrantless search should be justified under the exigent circumstances doctrine. More specifically, Officer Penvose argues that Drawdy was at large, committed a violent crime (domestic abuse), and was suspected to be at Plaintiff's residence. (Doc. 110 at 11).

In the absence of exigent circumstances, a home "may not reasonably be [entered] without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980). This is true even if officers are entering the home of a third party to search for a suspect. *Steagald v. United States*, 451 U.S. 204 (1981). An arrest warrant is not sufficient to permit such a search because "[a]rmed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances." *Id.* at 215. "The police thus bear a heavy burden of proving that the exigent circumstances exception validates a warrantless entry or search of a third party's home to look for a non-resident." *Bates*, 518 F.3d at 1245. To satisfy this burden, the police must demonstrate both probable cause and exigency. *Id.* If the exigency is an emergency, "'probable cause exists where law

enforcement officials "reasonably believe" that someone is in danger.'" *Id.* (quoting *United States v. Davis*, 3131 F. 3d 1300, 1302 (11th Cir. 2002).

Here, it is questionable whether Officer Penvose reasonably believed that Drawdy posed a danger to Plaintiff or the public at large.  Although Drawdy was wanted on allegations of domestic violence, there was no evidence that he was dangerously armed or his violence was likely to be directed at members of the public.  Given the personal nature of the crime of domestic violence, it is not the type of crime that would imply that an individual is dangerous to the public at large.

But even if Officer Penvose had reason to believe that Drawdy was a danger to Plaintiff or the public, Officer Penvose has not established facts sufficient to demonstrate that the situation was sufficiently urgent or that a true emergency existed.  Exigent circumstances require a "compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509 (1978).  Danger to human life has been found an exigent circumstance. *See United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002).  However, the circumstances of the present case do not present such exigent circumstances.

Officer Penvose was aware through dispatch that Drawdy was allegedly seen at Plaintiff's address the previous day, January 22, 2011.  (Doc. 110, Ex. A).  However, he also possessed information that Drawdy had informed the GPD that he was in Orange County, Florida.  (*Id.*).  When Officer Penvose arrived at Plaintiff's residence, Plaintiff told Officer Penvose that Drawdy was not there and that Plaintiff did not know Drawdy. (Plaintiff's Depo. at 188, 200-01).  Plaintiff also told Officer Penvose that officers from

the GPD had been at his residence the day before and searched for Drawdy.  (*Id.*).  Under these facts, even if Drawdy presented a danger to the public, Officer Penvose did not have sufficient information to believe that Drawdy was in Plaintiff's residence.  And, even if he did, the facts do not necessitate that the need to search was of such an urgent nature that it would be impossible or impracticable for Officer Penvose to obtain a search warrant.

Because Officer Penvose did not have Plaintiff's voluntary consent to search his residence nor face sufficiently exigent circumstances to justify his warrantless search, Officer Penvose violated Plaintiff's rights under the Fourth Amendment.  The question now becomes whether that right was clearly established at the time Officer Penvose conducted the search.

For a constitutional right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  In determining whether a right is clearly established, a court must determine whether the state of the law at the time the officers acted would give them "fair warning" that their conduct was unconstitutional.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  The Eleventh Circuit has established three ways the law can give an officer fair warning:

> First, the constitutional provision in question will be specific enough to establish clearly the law applicable to particular conduct and circumstances.  Where, however, the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then *turn to case law.*  Under this second method of providing fair and clear notice, a broad principle found in the case law can establish clearly the law applicable to a specific set of facts facing a government official when the principle is set forth with obvious clarity to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate

federal law when the official acted.  As a third method, if we have no case law with a broad holding that is not tied to particularized facts, we then look at precedent *that is tied to the facts.*

*Bates*, 518 F.3d at 1248 (citations and internal quotation marks omitted).

In the Eleventh Circuit, for consent to be voluntary, "it must be the product of an essentially free and unconstrained choice."  *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).  We must therefore examine whether on January 23, 2011, a reasonable officer would have believed that Plaintiff's consent to search was voluntary in light of a threat to arrest Plaintiff on unsubstantiated charges if he did not consent.  The Court concludes that the contours of the Fourth Amendment were sufficiently clear at that time that a reasonable officer would know that a threat of unlawful detention would render consent involuntary.

Similarly, Eleventh Circuit law was sufficiently clear that a nonconsensual, warrantless entry of a third party's home to search for a suspect is per se unreasonable absent exigent circumstances.  *See Bates*, 518 F.3d at 1249.  The court concludes that a reasonable officer in Officer Penvose's shoes would not have believed that exigent circumstances existed to justify a warrantless search.  There is no evidence that Drawdy presented a threat to Plaintiff or the public.  Furthermore, the only evidence Officer Penvose possessed indicating that Drawdy was in Plaintiff's home was a tip from dispatch that Drawdy was seen at Plaintiff's residence on the *previous* day.  None of these facts would lead a reasonable officer to believe that there was a life or death emergency such that he or she would be compelled to act.  Therefore, Officer Penvose is not entitled to qualified immunity on this claim.

**B.  The August 5, 2011 Entry (Count III)**

With respect to the August 5, 2011 entry of Plaintiff's residence, Plaintiff asserts a claim for violation of the Fourth Amendment under § 1983 against Officers Moore and Russell.[4]  However, Plaintiff has failed to establish a constitutional violation and Officers Moore and Russell are entitled to qualified immunity.

As discussed above, there is an "emergency" exception to the Fourth Amendment's warrant requirement.  *See Holloway*, 290 F.3d at 1334.  For example, police have been found generally justified to enter a home in response to a reported burglary so long as the totality of the circumstances support the likelihood that a burglary may be in progress.  In *Dockery v. Doyle*, 237 F. App'x 426 (11th Cir. 2007), police officers went to an apartment complex to talk to a suspect about an armed robbery and aggravated assault.  *Id.* at 427. The officers knew the apartment was in a high crime area.  Upon arrival at the apartment, one of the officers noticed the front door was cracked open, and another observed that the doorframe had small marks indicative of forced entry.  The officers knocked and announced, and no one responded.  One of the officers then heard footsteps inside the apartment, and the officers concluded that a forcible felony had occurred.  The Eleventh Circuit determined that these circumstances were sufficient to justify the officer's entry

---

[4]Plaintiff also asserted a claim for invasion of privacy under Florida law (Count IX), which survived the Officer Defendants' motions to dismiss.  But both the Officer Defendants and Plaintiff state that Plaintiff has only two remaining § 1983 claims against the Officer Defendants.  Neither the Officer Defendants nor Plaintiff address Plaintiff's claim for invasion of privacy.  Thus, it could be conceived that Plaintiff has abandoned this claim.  However, because Plaintiff's § 1983 claim for the August 5, 2011 entry of his residence is based on the same set of facts giving rise to Plaintiff's invasion of privacy claim, if the § 1983 claim fails, the invasion of privacy claim also fails.

under the exigent circumstances doctrine.  *Id.* at 429-30.  *Accord United States v. Porter*, 288 F. Supp. 2d 716, 720-21 (W.D. Va. 2003) (concluding that the triggering of a silent alarm was an exigent circumstance justifying a warrantless entry); *United States v. Johnson*, 9 F.3d 506 (6th Cir. 1993) (concluding that officer's observation of broken window while responding to burglary report was exigent circumstance justifying warrantless entry).

Here, Officers Moore and Russell responded to Plaintiff's residence based on a call from a neighbor that Plaintiff entered the home through a window and "he was not supposed to be there."  (Doc. 110, Ex. B).  Plaintiff admitted that he did not have a key to the residence and broke through the back window to get into the home.  (Plaintiff Depo. at 129).   Upon arrival, Officer Moore observed the front window to the residence was unsecured, and Plaintiff conceded that the front window was not locked and was open. (Doc. 110, Ex. B; Plaintiff Depo at 134, 168).  Officer Russell also observed that the rear window was broken.  (Doc. 110, Ex. B).

Officer Moore pulled back the blind on the front window and it looked like the residence appeared to be abandoned because there was no furniture or other signs of people living there.  (Doc. 110, Ex. B).  Plaintiff explained that he had already begun moving his belongings out of the residence and that the only furniture in the residence was located in the back room and the kitchen.  (Plaintiff Depo at 129, 173).  Plaintiff conceded that the residence looked vacant from the front window.  (Plaintiff Depo at 173).  The officers attempted to get someone to answer the door, and no one responded.  (Doc. 110, Ex. B).

Plaintiff stated that he did not hear the officers knock, but that he probably did not hear them because he was in the back room.  (Plaintiff's Depo at 135).

The officers entered the residence through the front window and encountered Plaintiff.  According to the officers, they ordered Plaintiff to the ground and placed him in handcuffs.  (Doc. 110, Ex. B).  Plaintiff, on the other hand, asserts that at this point the officers grabbed him, threw him to the ground, and began kicking him, before handcuffing him and placing him on his bed.[5]  (Plaintiff Depo at 141-46).

After Plaintiff told the officers that he lived there, the officers called the property manager, who explained that he was in the process of evicting Plaintiff.  (Doc. 110, Ex. B).  Plaintiff was then released and no further action was taken.

Under these facts and circumstances, a person of reasonable caution would have believed that an offense has been or is being committed.  *See United States v. Blasco*, 702 F.2d 1315, 1324 (11th Cir. 1983).  In fact, the officers behaved in accordance with the expectations placed upon them by the community in investigating this suspicious activity.  Consequently, Officers Moore and Russell had probable cause to enter Plaintiff's residence on the basis of an exigent circumstance, and Plaintiff has not demonstrated a violation of the Fourth Amendment.  Officers Moore and Russell are therefore entitled to qualified immunity, and, ultimately, summary judgment on this claim.[6]

---

[5]This claim is related to officers' entry of Plaintiff's residence.  Plaintiff did not assert a claim for excessive force, so the officers' interactions with Plaintiff after the entry are not relevant to the discussion of whether their entry violated the Fourth Amendment.

[6]Although neither party addressed it, Plaintiff's claim for invasion of privacy under Florida law based on this incident also remains pending (Count IX).  However, because Officers Moore and Russell established probable cause and exigent circumstances for entering Plaintiff's home on August 5, 2011, this claim fails and the officers would be entitled to summary judgment on this claim as well.

**II. Claims Against Sheriff Borders**

**A.  First Appearance (Count V)**

Two of Plaintiff's claims remain against Sheriff Borders related to his incarceration at the Lake County Jail.  First, Plaintiff asserts violation of the Fourteenth Amendment right to due process under § 1983 because Plaintiff did not receive a first appearance (Count V).  Plaintiff alleges that Sheriff Borders had a policy or procedure of negligence that denied individuals in custody their constitutional right to a first appearance hearing.

Section 1983 provides a private cause of action for a government's unconstitutional actions.  *Monell v. N.Y.C. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978).  It does not, however, impose liability simply on the basis of respondeat superior liability.  *Id.*; *see also McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).  Rather, a plaintiff asserting a § 1983 claim must show that the governing body itself caused his or her injury.  *McDowell,* 392 F.3d at 1289.  Specifically, to state a claim against a government agency under § 1983, the plaintiff must show: "(1) that his constitutional rights were violated; (2) that the [government] had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

Stated differently, a local government agency is liable for a civil rights violation "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694.  To establish a policy or custom, the plaintiff normally must show a persistent and widespread practice that, "although not authorized by written

law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (internal quotation marks omitted); *see also Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994). Thus, a local government agency, such as the Lake County Sheriff's Office, is entitled to summary judgment when the plaintiff cannot establish the existence of a policy or custom that was the moving force behind a constitutional violation—even assuming that the plaintiff can demonstrate a constitutional violation.

As an initial matter, Plaintiff has not demonstrated a constitutional violation committed by the Lake County's Sheriff's Office. "[W]here the [constitutional] right that a plaintiff claims a municipal entity violated arises from the substantive component of the Due Process Clause, the municipality's deliberate indifference to the constitutional right must, itself, 'shock the conscience.'" *Alexander v. City of Muscle Shoals*, 766 F. Supp. 2d 1214, 1234 (11th Cir. 2011); *see, e.g.*, *Lund v. Hennepin Cty.*, 427 F.3d 1123, 1126 (8th Cir. 2005) ("[E]stablishing a violation of due process as a basis for municipal liability under § 1983 requires plaintiff to show more than mere negligence or unreasonableness; a plaintiff must point to conduct by the municipality, or by employees acting with its knowledge, that shocks the conscience given the totality of the circumstances.").

A first appearance hearing was held for Plaintiff; Plaintiff was simply unable to attend the hearing due to his hospitalization. Plaintiff has not alleged or otherwise established the conduct of the Lake County Sheriff's Office that deprived him of a first appearance hearing. As such, Plaintiff has neither demonstrated conduct that "shocks the

conscience" nor that the deprivation of his first appearance hearing was caused by an act of the Sheriff's Office.

Even if Plaintiff could demonstrate a constitutional violation, he has not demonstrated that such violation occurred due to a policy or custom of the Lake County Sheriff's Office. The Lake County Sheriff's Office had specific written directives governing the processing of an inmate during booking. With respect to a first appearance hearing, the written directives provided that after booking paperwork is completed, an arrest affidavit/first appearance form is distributed to, among others, the State Attorney's Office and the Public Defender's Office. (Doc. 83, Ex. 5). Here, Plaintiff's first appearance hearing was held prior to his booking at the jail. According to the Lake County Jail's records custodian, it was the Sheriff's Office policy to remove an inmate's name from the jail's list of individuals requiring a first appearance once the jail received paperwork indicating that a first appearance had been held. (Doc. 83, Ex. 5 at ¶ 6). When the Sheriff's Office received Plaintiff's first appearance paperwork, Plaintiff would have been removed from the first appearance list. (*Id.*). Sheriff Borders has thus established that it was the Sheriff's Office custom and policy to make inmates available for a first appearance hearing.

Since the Lake County Sheriff's Office had a specific written policy and custom intended to ensure that inmates received a first appearance, it falls to Plaintiff to demonstrate a policy or custom based on persistent or widespread practice. Plaintiff has presented no evidence of a persistent and widespread practice of the Sheriff's Office preventing inmates from receiving a first appearance. The only instance Plaintiff has

19

presented is his own.   This is insufficient to demonstrate a policy or custom, and, consequently, Plaintiff's § 1983 claim fails.   Sheriff Borders is entitled to summary judgment on this claim.

### B.  Medical Treatment (Count VII)

Next, Plaintiff alleges violation of the Fourteenth Amendment right to due process under § 1983 against Sheriff Borders asserting deliberate indifference to Plaintiff's serious medical needs by jail personnel (Count VII).   Plaintiff asserts that the jail had a policy of failing to provide inmates with needed medications and medical treatment for obvious or disclosed medical or psychological conditions.

The Due Process Clause of the Fourteenth Amendment entitles anyone who is arrested and detained under state law to necessary medical care, and the deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991).  "To prevail on a deliberate indifference to serious medical need claim, [a plaintiff] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).

A "serious medical need" is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a lay person would easily recognize the necessity for prompt medical attention.  *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled on other grounds by Hope*, 536 U.S. 730.  For the

purposes of summary judgment, Sheriff Borders does not dispute that Plaintiff had a serious medical need with respect to his previous back injury and his mental health issues. (Doc. 83 at 13 n.7).  The crux of the issue, therefore, is whether the Sheriff's Office demonstrated deliberate indifference to Plaintiff's serious medical needs.  To establish deliberate indifference to a serious medical need, the plaintiff must show: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) . . . conduct that is more than mere negligence."  *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004); *see also Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Plaintiff first complains that the jail failed to provide him with a walking aid, such as wheelchair or cane, for approximately twenty-four hours which prevented him from being able to use the toilet or reach his food tray during this time.  Plaintiff's medical records demonstrate that Plaintiff received a cursory medical examination when he arrived at the jail for booking, and he informed the nurse that he had two broken vertebrae from a car accident five years prior which resulted in him using the assistance of a walker.  The nurse recorded that Plaintiff had a chronic back injury and recommended he be placed in the general population of the jail, but assigned a lower-level bunk.  Medical records obtained by the jail from Plaintiff's former doctor, Hubert H. Vesser, confirmed that Plaintiff had a lower back injury and he walked with the use of a cane.  (Doc. 83, Wright Aff., Ex. 1 at 30-32).

Plaintiff's blood pressure and pulse were checked approximately twice a day.  On August 24, a nurse noted that Plaintiff was not approved for a wheelchair, and it was on this same day that the wheelchair was removed from Plaintiff's cell.  (Doc. 83, Wright Aff.,

Ex. 1 at 20).  Later that day, Plaintiff was informed that he would need to be seen at "sick call" to be approved for the use of a wheelchair.  Plaintiff told the nurse that he used a cane at home.  Plaintiff was placed on sick call for evaluation.  When Plaintiff's blood pressure was checked that night at 8:00 p.m. there is no record that Plaintiff informed the nurse that he was having difficulties.[7]  Additionally, Plaintiff does not allege that he informed the nurses or other jail personnel that he was having difficulties getting to the toilet or reaching his food.

On August 25, at 1:00 p.m., Plaintiff was admitted to the infirmary.  The jail doctor noted that Plaintiff had a spinal injury and difficult ambulation.  Plaintiff was then provided with a walker.  He was also transferred to cell M5 in the medical ward.  On September 1, Plaintiff requested a transfer to Ward A, and he was moved on September 2.  He remained in Ward A for the remainder of his time in jail.

"Medical treatment violates the Eighth Amendment only when it is grossly incompetent, inadequate, or excessive as to shock the conscience or be intolerable to fundamental fairness.  Mere incidents of negligence or malpractice do not rise to the level of constitutional violations; rather care must be minimally adequate."  *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (citations and internal quotations marks omitted).  Plaintiff received minimally adequate medical care and attention while he was incarcerated.  He complains of an approximately twenty-four hour period where he was unable to move about his cell.  But he did not complain to the nurses or ask for assistance.

---

[7]Nurse Wright stated that it was customary for the nurses to note complaints received in their records.

Although Plaintiff's care may not have been precisely what he wanted, he has presented no evidence of deliberate indifference with respect to the jail's failure to provide him a walking aid for approximately twenty-four hours.

Plaintiff also complains that the jail did not provide him with the medications he was issued upon discharge from the hospital on August 21. The hospital prescribed Plaintiff Plavix, Lisinopril, Metoprolol, Zocor, and Nitrostat. A doctor from the jail ordered these medications. (Doc. 83, Wright Aff., Ex. 1 at 39). Plaintiff began receiving some of the medications as early as August 22, including Plavix, Lisinopril, and Metroprolol; Zocor was started on August 23; and Ultram and Flexeril (prescribed by the jail doctor) on August 24. (*Id.* at 40). Plaintiff could not specifically recall when he began receiving medications. Plaintiff was ultimately provided the appropriate medications for his medical conditions, and he has presented no evidence of a deliberate disregard of a serious medical need.

Finally, Plaintiff contends that the jail did not provide him with adequate mental health care. Written Directive 14.12.00 provides that "all inmates shall have access to mental health care provided by a licensed psychiatrist, mental health counselor, psychologist or other qualified mental health personnel." (Doc. 83, Bates-Perkins Aff. Ex. 11). The mental health personnel provide counseling and emergency services, including for suicidal ideations, gestures, or talk. The medical staff trains the corrections personnel in suicide prevention and intervention. (*Id.*).

Plaintiff never informed jail staff that he attempted suicide. Otherwise, the jail has procedures in place to recognize and prevent inmate suicide, and the jail has suicide watch

procedures.  On August 22, Plaintiff requested to see the psychiatrist and mental health counselor complaining of posttraumatic stress disorder ("PTSD") and other mental health issues.  (Doc. 98, Ex. C).  He also stated that he needed medication for anxiety and depression.  (Doc. 98, Ex. C).  The medical staff responded to Plaintiff requesting that he provide information for the physician who diagnosed his PTSD so the jail could request records for verification.  Plaintiff submitted a second request on August 26, and Plaintiff was provided a mental health examination on August 29.  (Doc. 83, Wright Aff., Ex. 1 at 16).  At all times, Plaintiff denied being suicidal.

Plaintiff again has failed to demonstrate that the jail failed to provide him with proper mental health treatment.  Although the treatment may not have been to Plaintiff's liking, it was no so inadequate as to shock the conscience and rise to the level of deliberate indifference.

Because Plaintiff has been unable to demonstrate deliberate indifference to a serious medical need, Plaintiff has not established a constitutional violation.  But even if Plaintiff could establish a constitutional violation, as with his previous claim against Sheriff Borders, Plaintiff would need to demonstrate that the constitutional violation occurred as a result of a custom or policy of the jail.  The jail has presented a myriad of evidence demonstrating its policies and procedures with respect to medical and mental health treatment for its inmates.  Plaintiff has presented no evidence to the contrary.

Plaintiff has also not demonstrated persistent and widespread practice.  During his deposition, he asserts that two inmates died during his incarceration due to inadequate medical care, but Plaintiff has presented no evidence to support this assertion.  Thus, it is

inadequate to establish his claim of a custom or policy.  Sheriff Borders is entitled to summary judgment on this claim.

## **CONCLUSION**

After due consideration, it is hereby **ORDERED AND ADJUDGED:**

1.      Defendant Sheriff Gary S. Border's Motion for Summary Judgment (Doc. 84) is GRANTED.

2.      Defendants Officer John Moore, Officer Charles Russell, and Officer Scott Penvose's Motion for Summary Judgment (Doc. 110) is GRANTED in part and DENIED in part as described herein.

**DONE** and **ORDERED** in Tampa, Florida, this 16th day of August, 2016.


JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE


Copies furnished to:
Counsel/Parties of Record